# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HAROLD E. CLARK, | ) |
| Plaintiff, | ) |
| | ) No. 2:13-cv-00928 |
| v. | ) |
| GREATER PENNSYLVANIA CARPENTERS' PENSION FUND and JAMES R. KLEIN, | ) |
| Defendants. | ) |

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiff Harold Clark ("Clark"), through his counsel, respectfully submits the following Brief in Support of his Motion for Summary Judgment.

This is an Employee Income Retirement Security Act ("ERISA") action challenging the suspension of Clark's pension benefits by the Greater Pennsylvania Carpenters' Pension Fund (the "Fund") and James Klein as administrator of that fund ("Klein") (collectively, "Defendants"). The dispute between the parties is a narrow legal question: is Clark's employment at George Junior Republic ("GJR") employment in the construction industry? The undisputed facts and applicable law make clear that his employment at GJR does not constitute employment in the construction industry and, accordingly, Clark is entitled to summary judgment on his claim that Defendants wrongfully denied him the pension benefits he earned.

## I. FACTS

As set forth in his Statement of Material Undisputed Facts filed herewith, the following facts are not in dispute. At relevant times prior to June 2008, Clark was an employee of a contributing employer or employers to the Fund and, as such, automatically

participated in and was enrolled in the Fund during those times when he was covered by a collective bargaining agreement between the United Brotherhood of Carpenters and Joiners of America ("Union") and his employer(s) ("covered employment"). Clark is a participant and/or beneficiary within the meaning of ERISA.

Clark retired from covered employment on or about June 2008, prior to the age of 65. Letter regarding Pension Application Forms, **Exhibit B** (all exhibits are part of the Appendix)**.** At that time, Clark became eligible for early retirement pension benefits from the Fund pursuant to the Fund's Agreement and Declaration of Trust (the "Agreement"), **Exhibit A**, which benefits the Fund promptly began paying Clark monthly. The monthly gross pension payment was approximately $1400. *See* August 28, 2013 August 28, 2013 Benefits Payment Report, **Exhibit C** for exact amounts.

By letter dated July 9, 2009, **Exhibit D**, and addressed to Clark, Klein, on behalf of the Fund, advised Clark that his "monthly benefit is suspended effective immediately," because it "has been reported to us that you have returned to work for George Junior Republic Reform [sic]." Klein further explained that the Fund stated that a "payment to a retiree prior to age 65 shall be suspended during any period in which the participant returns to active employment in an industry which is subject to a collective bargaining agreement with the [Union] or returns to active service with an employer who has an agreement. That means that if you return to work in any job, union or non-union, in the construction industry anywhere after you begin receiving pension benefits, your benefits must be suspended." *Id.*

At the time, Clark was employed by GJR as its Facility Manager, which employment continues to this day. GJR is a private, non-profit residential treatment

2

facility for delinquent and dependent boys aged from eight to eighteen. *See* GJR Brochure **Exhibit H.** It has a campus in Grove City, Pennsylvania, which is where Clark works. GJR offers residential living facilities for its youth, fully accredited educational programs, a wide variety of therapeutic activities, and continuing care.

As GJR's Facility Manager, Clark "oversee[s] all buildings, food, utilities, automobiles, grounds." *See* Deposition of Hal Clark, at p.8, in *Galloway v. George Junior Republic*, **Exhibit F.** The Facility Manager serves as the supervisor of Procurement, Maintenance, Auto Shop and Project Development…" Job Description, **Exhibit G**. GJR does not have a collective bargaining agreement with the Union.

The July 9 letter from Klein to Clark advised that Clark could appeal the decision to suspend his pension benefits consistent with Article XI of the Agreement. **Exhibit D**. *See also* 6-15-09 Defendants' Notes regarding Harold Clark, **Exhibit E**. Article XI of the Agreement states that Clark could appeal the decision to deny him benefits within 90 days. Agreement, **Exhibit A.**

By letter dated October 5, 2009, **Exhibit J**, addressed to Klein, Clark, through counsel, timely submitted his appeal of the Fund's decision to deny him pension benefits. In his appeal, Clark argued that his employment with GJR was not work in the construction industry and that he did not hold a job in a construction trade or craft. Clark asked that his pension payments be reinstated immediately and that he be forwarded all payments which had been withheld.

By letter dated November 5, 2009, attached here to as **Exhibit K**, Klein, on behalf of the Fund, denied Clark's appeal. The November 5 letter stated that Clark could appeal the denial to the Fund's Trustees within 60 days of receipt. *Id.*

By letter dated December 31, 2009, **Exhibit L**, to Klein, Clark, through counsel, timely appealed the November 5 denial of benefits. A meeting of the Fund's Pension Plan Appeals & Enforcement Committee was held on March 17, 2010, at Fund headquarters, for the purpose of reviewing Clark's appeal, **Exhibit M,** which meeting Clark was invited to, and did attend, and at which meeting he presented argument and evidence.

By letter dated May 6, 2010, **Exhibit N**, from Klein on behalf of the Fund, the Fund finally denied Clark's appeal on the same grounds as its previous denial. The May 6 letter specifically provided that the "Fund does not provide for any additional levels of appeal . . . . [Y]ou have a right to bring an action against the Pension Fund under Section 502(a) of ERISA." *Id.* Clark has exhausted the administrative remedies provided by the Fund. The Fund has continued to suspend pension benefit payments to Clark.

## II. ARGUMENT

### A. Wrongful Denial of Benefits

This ERISA action is brought pursuant to 29 U.S.C. § 1132(a)(1)(B), which creates a civil cause of action for a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Clark seeks pension benefits from the Fund which he argues were wrongfully suspended. The Fund suspended Clark's pension benefits, purportedly under the authority of the Agreement and, in particular, Article VIII, Section 4, subpart (i), which authorizes the Fund to suspend pension benefits during the period in which a participant "returns to active employment in an *industry* which is subject to a collective Bargaining Agreement with the United Brotherhood of Carpenters and Joiners of America." Agreement, **Exhibit A** (emphasis supplied)**.** This provision suggests just one issue for review: Does Clark, by his employment with GJR,

4

work in an "industry" which is subject to a collective bargaining agreement ("CBA") with the Union? If so, then the Fund properly suspended Clark's benefits consistent with the Agreement. But if GJR is not in an industry subject to a Union CBA, then it necessarily follows that the Fund's decision to suspend Clark's benefits was patently wrong.[1]

### B. Standards of Review

Clark's summary judgment motion may be granted if, drawing all inferences in favor of the Fund, "the pleadings, the discovery and the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). Indeed, Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . ." *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

> [W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

For actions brought under Section 1132(a)(1)(B) for denial of benefits, the Court's standard of review of the plan's decision is "a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for

---

[1] Per subpart (ii) of Article VIII, Section 4 of the Agreement, the Fund may also suspend benefits if the participant "returns to active service with an Employer hereunder." Exhibit I. There is no dispute, however, that GJR is not an "Employer hereunder," because it does not have a CBA with the Union and does not have any employees who participate in the Fund by virtue of their employment with GJR.

benefits or to construe the terms of the plan." *Doroshow v. Hartford Life & Acc. Ins. Co.*, 574 F.3d 230, 233 (3d Cir. 2009) *quoting Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When the administrator has discretionary authority to determine eligibility for benefits, the decision is reviewed under an arbitrary and capricious standard. *Id*. If the arbitrary and capricious standard is applied, a court may overturn the decision of a plan administrator "if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* at 234.

The United States Court of Appeals for the Third Circuit has applied the following rules of construction of contracts to ERISA plans: "the plan must be considered as a whole; straightforward, unambiguous language should be given its natural meaning; and, if a specific provision found in the plan conflicts with a general provision, the specific provision should control." *Saltzman v. Independence Blue Cross*, 384 F. App'x 107, 114 (3d Cir.2010). As summarized by the United States District Court for the Western District of Pennsylvania:

> In reviewing a plan administrator's interpretation of an ERISA plan we must first examine whether the terms of the plan document are ambiguous (citation omitted). If the terms are unambiguous, then any actions taken by the plan administrator inconsistent with the terms of the document are arbitrary. But actions reasonably consistent with unambiguous plan language are not arbitrary. If the reviewing court determines the terms of a plan document are ambiguous, it must take the additional step and analyze whether the plan administrator's interpretation of the document is reasonable.

*DiBartola v. U.S. Steel*, 12CV1812, 2013 WL 3305221 at *9 (W.D. Pa. June 28, 2013).

The determination of whether a term is ambiguous is a question of law. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir.1980). A term is

ambiguous if it is subject to reasonable alternative interpretations. *Taylor v. Cont'l Grp. Change in Control Severance Pay Plan*, 933 F.2d 1227, 1232 (3d Cir. 1991).

### C. The Fund's Actions Are Inconsistent With Unambiguous Terms

A Plan Administrator has discretion in administering the terms of an agreement, but "the interpretation may not controvert the plain language of the document." *Epright v. Envtl. Res. Mgmt., Inc. Health & Welfare Plan*, 81 F.3d 335, 339 (3d Cir. 1996). Plain language interpretation considers the language "in an ordinary and popular sense as would a person of average intelligence and experience." *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007). Even if plan language has been consistently interpreted in a specific way, a past practice "is of no significance where the plan document is clear." *Epright*, 81 F.3d at 339.

In this case, the Agreement does not define the term "industry," but the meaning of the word would seem clear. Merriam's Ninth New Collegiate Dictionary defines "industry" as a "distinct group of productive or profit-making enterprises (the banking ~)." Thus, when one talks about "industry," one talks about the banking industry, or the steel industry, or the retail industry or the construction industry.

Notwithstanding the patent meaning of the term, "industry," the Fund somehow has interpreted the term to be equivalent to "job." For example, in its November 5, 2009 letter denying Clark's initial protest of the suspension of his pension benefits, it stated that the "Claimant's *position* with GJR is employment in the construction industry," and then explained how his job duties were "similar" to those performed by Union employees. **Exhibit K** at p.2 (emphasis supplied). The Fund went on to opine that, while Clark argued "that the employer be primarily associated with that industry . . . the [ERISA] regulations

require only that the employee perform work in the 'industry' (regardless of the nature of the employer). (Refer to 29 § C.F.R. 2530.203-3(c)(2))." *Id.*

In its May 6, 2010, letter denying Clark's second appeal, the Fund reiterated its position. It stated that the "nature of employment with any employer is the standard by which any employer could be subject to a CBA with the Union." **Exhibit N** at p.3 (emphasis in original). It then repeated that ERISA regulations require only that the employee perform work in the industry regardless of the nature of the employer, again citing 29 C.F.R. § 2530.203-3(c)(2) for that proposition. *Id.*

The Fund, then, has made its position clear: one works in the industry if one performs job duties similar to those performed by others individuals covered by Union CBAs. But that interpretation of "industry" ignores the plain meaning of the word. "Industry" is not a synonym for job, or job duties. "Industry" is a distinct group of enterprises producing similar products or providing similar services.

If there was any doubt that the Fund's construction of the term, "industry," is utterly divorced from the plain meaning of the term, 29 C.F.R. § 2530.203-3(c)(2) eliminates that doubt. The regulation at 29 C.F.R. § 2530.203-3(c)(2) does not apply to suspension of pension benefits for those who take early retirement, like Clark. Rather, it applies to the suspension of pension benefits who retire at a regular retirement age. But, the Agreement, at Article VIII, Section 4, supbart (i), explicitly incorporated the language of 29 C.F.R. §2530.203-3(c)(2) and, perhaps even more importantly, the Fund has explicitly relied on the regulation to deny Clark's appeal. *See* November 5, 2009 Initial Claim Response Letter, **Exhibit K**; May 6, 2010 Appeal Response Letter, **Exhibit N** ("In your claim letter and appeal letter, you appear to assume that by 'industry,' the Federal

Regulations require that the employer be primarily associated with that industry. In contrast, however, the Regulations require only that the employee perform work in the 'industry' (regardless of the nature of the employer). (Refer to 29 C.F.R. § 2530.203-3(c)(2))").

Thus, 29 C.F.R. § 2530.203-3(c)(2) provides a clear window into what the term "industry" means. Its plain language indicates that a multiemployer pension plan, like the Fund here, may suspend benefits of an employee only when each of the following three conditions has been satisfied: the individual is employed in the same industry, in the same trade or craft, and in the same geographic area. As noted in ERISA Opinion No. 84-21A 1984 WL 23436 (1984), "the 'industry' test is in addition to, and separate from, the 'trade or craft' test and, therefore, the 'industry test cannot be applied solely on the basis of the trades or crafts performed by individual employees without being duplicative of the 'trade or craft' test." **Exhibit O** at *2. Whether a retired employee is working within the same industry is resolved with regard to "the business activities of the employer, taking into consideration the products and/or services offered by the employer in the course of its business activities and such other facts and circumstances as may be relevant to such determination." ERISA Opinion No. 84-21A 1984 WL 23436 at *2 (1984). *See also* 29 C.F.R. § 2530.203-3(c)(2)(i) ("The term "industry" means the business activities of the types engaged in by any employers maintaining the plan."); *Rules and Regulations for Minimum Standards for Employee Benefit Plans; Suspension of Benefit Rules*, 46 FR 8894-01 ("under this provision it is the type of business activity engaged in by the employer of the retiree").

As the regulation and the administrative interpretations of that regulation make clear, the term "industry" and the "trade and craft" test (the job duties test) are independent prongs of the inquiry directed by the regulation. In other words, the term "industry" DOES NOT equal job duties, as the Fund claims. The Fund's construction of the term "industry" to equate to job duties, and its corresponding decision to suspend Clark's pension benefits based upon that construction, cannot withstand scrutiny and are undoubtedly arbitrary and capricious.

Instead, the plain meaning of the term "industry," supported by the meaning ascribed to the term by the very regulation relied on by the Fund, counsels focus on the type of business activity engaged in by GJR, and not the job duties of Clark. In that regard, GJR operates in a unique industry segment. It is a private, non-profit residential treatment facility for delinquent and dependent boys aged from eight to eighteen, which offers residential living facilities for its youth, fully accredited educational programs, a wide variety of therapeutic activities, and continuing care. Its industry segment, then, would be something like, "residential treatment facilities" for youth. A very broad description might be, "residential mental health provider." GJR's "competitors," so to speak (enterprises providing similar services in Pennsylvania) are Summit Academy, Glade Run Lutheran Services, Holy Family, Harbor Creek, and Glen Mills.

So, the question, then, is whether the Union has a CBA in the same industry as GJR, e.g., does Clark work in an *industry* subject to a CBA with the Union. Clark sought an answer to the precise question when, by interrogatory, it asked the Fund to identify all CBAs the Union has or has had since 2008 in the same industry as GJR. The Fund offered no concrete answer and identified no specific CBA. Instead, it simply referred to and

provided a 227-page list of businesses with whom the Union had or has CBAs, **Exhibit I**. Given the Union's prominence in the construction trades, it is not surprising that the list is heavy on construction companies, construction consulting firms, contractors, construction engineering firms, furniture companies, excavation companies, and so forth. But none of the companies in the 227-page list conduct business in an arena even close to the industry in which GJR operates. None of the companies with whom the Union has a CBA is a residential treatment facility or a provider of mental health services. Certainly, Summit Academy, Glade Run Lutheran Services, Holy Family, Harbor Creek, and Glen Mills, which are similarly situated organizations, are not on the list. And the Fund's response to the interrogatory offers no other exemplar.

In short, the evidence of record establishes that Clark is not employed in an industry with a CBA with the Union, making the Fund's decision to suspend his benefits both indefensible and inconsistent with the unambiguous provisions of the Agreement. Accordingly, Defendants acted arbitrarily in suspending Clark's benefits, entitling Clark to summary judgment on his denial of benefits claim.

### D. The Fund's Interpretation of the Agreement is Unreasonable

While the interpretation of what it means to be employed in an industry with a Union CBA seems straightforward, if the Court nevertheless determines that this provision is ambiguous, Clark remains entitled to summary judgment. "Extrinsic evidence may be used to determine an ambiguous term." *Epright v. Envtl. Res. Mgmt., Inc. Health & Welfare Plan*, 81 F.3d 335, 339 (3d Cir. 1996).

One piece of extrinsic evidence is the Fund's reliance throughout this procees on 29 C.F.R. § 2530.203-3(c)(2), which it has consistently used to buttress its position that the

11

Agreement's reference to "industry" is actually to a participant's plan duties. While that regulation does not apply to early retirements, the Fund is well within its rights to incorporate the regulation into the Agreement and its interpretation of the Agreement. *See e.g. Dennis v. Bd. of Trustees of Food Employers Labor Relations Ass'n & United Food & Commercial Workers Union Pension Fund*, 620 F. Supp. 572, 576 (M.D. Pa. 1985) *modified sub nom. Dennis v. Bd. of Trustees of Food Employers Labor Relations Ass'n*, 625 F. Supp. 976 (M.D. Pa. 1986) (noting that the Plan could have legally prohibited the participant, who had not yet attained normal retirement age, from receiving pension benefits upon any reemployment, but instead permitted him "to work, as long as his reemployment is not in the same industry, in the same trade or craft and in the same geographic area covered by the plan.").

But if the Fund is going to use 29 C.F.R. § 2530.203-3(c)(2), then it must follow the contours of that regulation. If it does not, then it acts arbitrarily and capriciously. Here, despite adopting 29 C.F.R. § 2530.203-3(c)(2), the Fund misapplied the industry test therein. As explained in more detail above, the industry test is in addition to and separate from the question of whether the participant had job duties comparable to his former trade or craft. To suspend his pension benefits, the Fund needed to find that Clark's work with GJR was in the same industry as other employers with Union CBAs, and not merely that Clark's job duties were similar to other Union members. The Fund did not so find, nor can it so find, that Clark worked in the same industry as other employers with Union CBAs.

Another piece of extrinsic evidence is that the Fund has consistently maintained throughout their communications that the "industry" referred to in Agreement is the construction industry. *See e.g.,* Letter regarding Pension Application Forms, **Exhibit B**;

July 9, 2009 and September 30, 2009 Letters Suspending Benefits **Exhibit D** ("This means that if you return to work in any job, union or non-union, in the construction industry anywhere after you begin receiving pension benefits, your benefits may be suspended."). *See also* November 5, 2009 Denial of Appeal Letter, **Exhibit K;** May 6, 2010 Denial of Appeal Letter, **Exhibit N** ("[T]he Trustees have determined that the Claimant's position with GJR is employment in the construction industry…"). GJR is not in the construction industry. It does not provide construction products, nor does it provide construction services. In fact, when it needs construction services, it hires an outside company to perform such services.

Nor is Clark employed in a job in the construction industry. Clark works for GJR as its Facility Manager. As Facility Manager, Clark essentially oversees GJR's facilities. His sole connection to the construction industry is that he will occasionally secure and terminate contractors and sub-contractors and ensure that quality standards are maintained in regards to construction. Such work, while perhaps tangentially related to construction, is not for an employer in the construction industry. Nor is the work the type of work performed by Union members, since, at a minimum, it is management work, and not the labor performed by Union members.

Given these circumstances, the Fund's decision to suspend Clark's pension benefits is wholly unreasonable. Defendants have arbitrarily and capriciously interpreted industry to be "very broad" and "based on the work performed, not for whom the work is performed." November 5, 2009 Initial Claim Response Letter, **Exhibit K**; May 6, 2010 Appeal Response Letter, **Exhibit N**. Their interpretation is inconsistent with any interpretation of the term "industry." Furthermore, the Fund interpretation of "industry" to

13

include effectively any business that hires a construction company to work on their property is arbitrary and capricious and deprives Clark of the benefits he is entitled to under the Agreement. *See Brown v. S.Cal. IBEW-NECA Trust Funds*, 588 F.3d 1000, 1003 (9th Cir. 2009) (holding that a plan administrator abuses its discretion if its "interpretation of the Plan creates a much broader category of prohibited activities than is supported by the plain language of the Plan.")

As described by the Supreme Court, "the centrality of ERISA's object [is] protecting employees' justified expectations of receiving the benefits their employers promise them. *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743, (2004). In another case, the Supreme Court also noted that:

> Nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan. ERISA does, however, seek to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits.

*Lockheed Corp. v. Spink*, 517 U.S. 882, 887, (1996). An employee should be able to reasonably rely on his understanding of the plan requirements based on a close reading of the plan agreement. If the plan documents are interpreted in a way that is so beyond how a reasonable person would understand the requirements, then the plan is undermining the employee's justified expectations.

In *Tapley v. Locals 302 & 612 of Int'l Union of Operating Engineers-Employers Const. Indus. Ret. Plan*, 728 F.3d 1134 (9th Cir. 2013), an appeal from the suspension of benefits of two individuals, the Ninth Circuit Court of Appeals found that the Trustees had abused their discretion in interpreting the language of a multi-employer, collectively bargained pension plan. In doing so, the court noted that "[t]he availability of earned

retirement benefits cannot be frustrated by an untethered interpretation of the Plan that takes away what the Plan was designed to provide," *id.* at 1143, "or lacks any rational nexus to the primary purpose of the Plan." *Id.* at 1140. In that case, the court noted that even though ERISA does not require the provision of benefits to early retirees, the Plan can and did choose to provide those benefits. *Id.* at 1143. Under that plan, early retirees receiving benefits could have their benefits suspended if they worked a certain number of hours within the same geographic area, in the same job classification, and in the same industry as when they worked in covered employment. *Id.* at 1137. The participants appealed the suspension of benefits by the Trustees based on an erroneous interpretation of the same job classification requirement. *Id.* at 1137-38.

The court acknowledged that, although "[i]t is not for this Court to proffer a reasonable interpretation of Plan language," it is the court's responsibility to "identify and reject any interpretation that is arbitrary, misfocused and contrary to the intent of those responsible for its terms." *Id.* at 1143. The Ninth Circuit found that the Trustees' interpretation of the plan's skills and duties test was vague and overbroad, rendering the job classification requirement in the plan essentially meaningless and contravening the purpose of the plan. *Id.* at 1141. In interpreting the job classification requirement:

> the Trustees ignored these fundamental differences and chose instead to emphasize any 'similar' and 'analogous' duties, skills, and general competencies—many of which were listed in broad job abstracts—without properly considering how incidental they were, how seldom the duties were performed, or whether the skills [the participant] developed during the many years of Covered Employment were ever used or required at all." *Id.* at 1141. The court also noted that a "modest overlap is far from meaningful considering how different the positions are in actual practice.

*Id.* at 1141.

15

The *Tapley* case is analogous to this one. Both involve a multi-employer, collectively bargained pension plan and a dispute over suspension of early retirement pension benefits. In both cases the Trustees interpreted the language of the agreement so broadly so as to render the conditions for suspension of benefits meaningless and deprive participants of what they were entitled to under the agreement. Like in *Tapley*, Defendants in this case ignored the fundamental differences between the business of GJR and the construction industry, and chose to focus on the incidental overlaps that would exist between any business, in almost any industry, and the construction industry.

The Fund's overly broad interpretation of what constitutes employment in an industry with a Union CBA would effectively prohibit any reemployment as most companies are likely to use construction services. Simply because a participant oversees selection of contractors as one among many of his job duties, that cannot reasonably be construed to constitute employment in the construction industry. The proper application of Article VIII, Section 4, subpart (i) of the Agreement is that an employee's benefits may be suspended if he works for an employer in the construction industry or another industry with a CBA with the Union, just as the Fund repeatedly stated in its communications with Clark. The Fund must be held to this representation: "Pension plan participants should be able to reasonably rely on plan terms in planning their retirement." *Tapley*, 728 F.3d at 1141. The Fund has arbitrarily and capriciously been applying this provision to suspend the benefits of participants who tangentially interact with members of the construction industry in their reemployment, or who work for an employer using the services of the construction industry. If the Fund had intended to exclude all reemployment for individuals in early retirement, it could have done so through the language of the

Agreement but it did not. The Fund cannot ignore the terms of the Agreement and based on those terms, it cannot suspend the benefits of a participant employed in an industry other than the construction industry.

In short, the Defendants ignored the generally accepted meaning of the term "industry" and interpreted it in a manner entirely opposed to the term's use in federal regulations. It somehow concluded that a residential treatment facility for delinquent boys was in the construction industry and that Clark, the Facilities Manager, worked a construction job. The Fund's actions here are classic hallmarks of an arbitrary and capricious decisionmaking process designed to make early retirement pension benefits illusory for those who seek new employment. Clark is therefore entitled to summary judgment.

### E. Defendants' Counterclaim for Equitable Restitution

Defendants counterclaim for equitable restitution in the amount of $17,961.38, for alleged overpayment of benefits while Clark was engaged in covered employment. Their claim should be dismissed because they wrongfully suspended Clark's pension benefits in the first instance. But if the Court finds that Defendants properly suspended Clark's benefits, they are still not entitled to the immediate lump sum repayment which they seek.

To begin, there is no provision the Agreement for an immediate lump repayment. Rather, the Agreement provides for repayment through offset when benefits are suspended. Agreement at Art. VIII, Sect. 4, **Exhibit A**. This is consistent with 29 C.F.R. § 2530.203–3(b)(3), which provides that the plan can only offset amounts allegedly owed once monthly benefits payments resume, and even then can only offset a maximum of 25% of the month's total benefit payment which would have been due but for the offset. The regulation provides as follows:

17

> (3) Offset rules. A plan which provides for the permanent withholding of benefits may deduct from benefit payments to be made by the plan payments previously made by the plan during those calendar months or pay periods in which the employee was employed in section 203(a)(3)(B) service, Provided, That such deduction or offset does not exceed in any one month 25 percent of that month's total benefit payment which would have been due but for the offset (excluding the initial payment described in paragraph (b)(2) of this section, which may be subject to offset without limitation).

29 C.F.R. § 2530.203–3(b)(3).

If the Defendants' claim for repayment is not grounded in the language of the Agreement or the regulations but rather, in equity, then equity favors Clark. Although disputed, Clark claims that he told Defendants whom he would be working for after his retirement. Moreover, as explained above, it is entirely reasonable for Clark to believe that his employment with GJR was not in an "industry" with a Union CBA. Neither the plain meaning of the term, "industry," nor the interpretation given to it by regulation, would have given Clark any reason to believe that his employment with GJR, as a Facilities Manager, would have in any way warranted suspension of his pension benefits. The Fund did not convey its overly expansive definition of the construction industry until after the payments had been made and future benefits were suspended. As such, if Clark was not entitled to those payments, it would be inequitable to require Clark to pay the Fund almost $18,000 in a lump sum for its strained construction of its own Agreement.

### III.   CONCLUSION

For the reasons set forth in detail above, Clark is entitled to summary judgment as a matter of law. Clark respectfully requests judgment as follows:

a) a declaration that Defendants' suspension of Plaintiff's benefits was wrongful;

b) an injunction prohibiting the continued wrongful suspension of benefits and an order that such payment commence immediately;

c) an award of prejudgment interests;

d) an award of reasonable attorney's fees pursuant to 29 U.S.C. s 1132(g)(1);

e) an award for costs incurred; and

f) a dismissal of Defendants' Counterclaim with prejudice.

Respectfully submitted:

/s/ Kaitlin C. Dewberry
Michael A. Pavlick,
Pa. ID. 60914
Kaitlin C. Dewberry
Pa. ID 313616
K&L Gates LLP
K&L Gates Center
210 Sixth Ave.
Pittsburgh, PA 15222
(412) 355-6500 (phone)
(412) 355-6501 (fax)

Dated: December 2, 2013.                         Attorneys for Plaintiff